PAUL H. TONKS (#11821)
MEB W. ANDERSON (#10227)
Assistant Utah Attorneys General
JOHN E. SWALLOW (#5802)
Utah Attorney General
5110 State Office Building
P.O. Box 142477
Salt Lake City, Utah  84114-2477
Telephone: (801) 538-9501
Facsimile:  (801) 538-3313
E-mail: ptonks@utah.gov
E-mail: mebanderson@utah.gov

*Attorneys for Defendants, State of Utah & Governor Gary R. Herbert*

---

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>vs.<br><br>THE  STATE  OF  UTAH;  and  GARY  R. HERBERT, Governor of the State of Utah, in his official capacity,<br><br>      Defendants. | **MEMORANDUM IN OPPOSITION TO THE UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION**<br><br><br>Judge David Nuffer<br><br>Case No. 2:13-CV-332-DN |

Defendants State of Utah and Governor Gary R. Herbert (collectively "State of Utah" or "Utah") by and through their counsel, Assistant Utah Attorneys General Paul H. Tonks and Meb W. Anderson, hereby file their Memorandum in Opposition to the United States' Motion for Preliminary Injunction.

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ ii

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTON ...................................................................................................................... vi

LEGAL STANDARD ............................................................................................................... vii

ARGUMENT .............................................................................................................................. 1

    I.     THE UNITED STATES IS UNLIKELY TO PREVAIL ON THE MERITS. ................ 1

      A.   The United States' Facial Challenge Burden. ........................................................... 1

      B.   H.B. 155 is Consistent with the Supremacy Clause ................................................. 2

         1. Utah Code Ann. §§ 53-13-106.5(2) and (6) Properly Restrict DOI and USDA
         Employees from Co-opting Utah Law Enforcement Authority ................................. 4

           a.    Congress Did Not Grant the DOI Authority to Unilaterally Enforce Utah Law.
                            ........................................................................................................................ 5

              i.   FLPMA. ..................................................................................................... 5

              ii.   National Park Service Organic Act of 1916 ........................................... 6

              iii.  Statutes Governing FWS ......................................................................... 7

              iv.  Statutes Governing BOR .......................................................................... 7

           b.    Congress Did Not Grant the USDA Authority to Unilaterally Enforce Utah
             Law ...................................................................................................................... 8

         2. Utah Code § 53-13-106.5(4) Does Not Place Restrictions on DOI or Conflict with
         Federal Law by Imposing Unwarranted Restrictions on the DOI's Management of
         Federal Lands. .......................................................................................................... 9

           a.    H.B. 155 Subsections (4)(a)(i) & (4)(b) ......................................................... 10

           b.    H.B. 155 Subsection (4)(a)(ii) ......................................................................... 15

    II.    THE UNITED STATES WILL NOT SUFFER IRREPARABLE HARM. ................. 18

    III.   THERE IS NO THREATENED INJURY AND AN INJUNCTION WILL BE
         ADVERSE TO THE PUBLIC INTEREST. ................................................................ 19

CONCLUSION ......................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Wright*, 468 U.S. 737 (1984) .......................................................................... 19

*American Target Advertising, Inc. v. Giani*, 199 F.3d 1241 (10th Cir. 2000)............................. 19

*Cotton States Mut. Ins. v. Anderson,* 749 F.2d 663 (11th Cir. 1984)............................................. 2

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 356 F.3d 1256 (10th Cir. 2004) ...... 18

*Dorchy v. State of Kansas*, 264 U.S. 286 (1924) .......................................................... 19

*Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208 (2009).......................................................... 6

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992) ................................................ 3, 9

*Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250 (10th Cir. 2003) ............................... vii

*Guste v. Jackson*, 429 U.S. 399 (1977)........................................................................ 19

*Heideman v. South Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003) ........................................... 18

*Kleppe v. New Mexico*, 426 U.S. 529 (1976)......................................................................... 5

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ....................................................... 5

*Laratta v. McCormac*, 2010 WL 3341282 (D. Colo. 2010) .......................................... 18

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998)........................... 12

*Marion Energy, Inc. v. KFJ Ranch P'Ship*, 267 P.3d 863 (Utah 2011) ......................................... 2

*N.Y. Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405 (1973)........................................................ 3

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, —U.S.—, 132 S.Ct. 2566 (2012).................................... vi

*Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66 (1st Cir. 2001)......................................... 3

*Rizzo v. Goode*, 423 U.S. 362 (1976)....................................................................... 19

*Stewart v. Utah Pub. Serv. Comm'n*, 885 P.2d 759 (Utah 1994)................................................ 19

*Treacy v. Newdunn Associates, LLP*, 344 F.3d 407 (4th Cir. 2003)............................................. 11

*U.S. v. Jones*, 428 F. Supp.2d 497 (W.D. Va. 2006) ................................................................ 17

*U.S. v. Snyder*, 852 F.2d 471 (9th Cir. 1988)......................................................... 17

*Union Trust Co. v. Simmons*, 211 P.2d 190 (Utah 4919)................................................ 19

*United States v. Grimaud*, 220 U.S. 506 (1911) ..................................................... 16, 17

*United States v. Salerno*, 481 U.S. 739 (1987) .......................................................... 2

*United States v. Vasquez-Alvarez*, 176 F.3d 1294 (10th Cir. 1999), .......................................... 2, 3

*Utah v. Drej*, 233 P.3d 476 (Utah 2010) ................................................................................................ 2

*Wash., Dep't of Soc. & Health Servs. v. Bowen*, 815 F.2d 549 (9th Cir.1987) ............................... 3

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008), ......... 1, 2

*Whitman v. American Trucking Assns.*, Inc., 531 U.S. 457 (2001) ..................................................... 6

*Winter v. Nat'l Resources Def. Council, Inc.,* 555 U.S. 7, 22 (2008) ................................... 18, 19

*Wyeth v. Levine*, 555 U.S. 555 (2009) ................................................................................................ 2

**Statutes**

16 U.S.C. § 1a-6(b)(1) ......................................................................................................................... 6

16 U.S.C. § 1a-6(c)(2) .......................................................................................................................... 7

16 U.S.C. § 559 ..................................................................................................................................... 8

16 U.S.C. § 559g(c) .............................................................................................................................. 8

16 U.S.C. § 668dd(g) ........................................................................................................................... 7

43 U.S.C. § 1733 ................................................................................................................................. 10

43 U.S.C. § 1733(c) ................................................................................................................... 4, 5, 15

43 U.S.C. § 1733(d) ............................................................................................................................. 6

43 U.S.C. § 373b(c)(1) ......................................................................................................................... 7

43 U.S.C. §. 1733(a) ............................................................................................................................ 9

43 U.S.C. §. 1733(c)(1) .................................................................................................. 9, 10, 11, 12, 14

43 U.S.C. §. 1733(c)(2) ................................................................................................................... 9, 10

U.S. Const. art. IV, § 3, cl. 2 .............................................................................................................. 2

U.S. Const. art. VI, cl. 2 ..................................................................................................................... 1

Utah Code § 53-13-106.5 .................................................................................................................. 20

Utah Code Ann. § 53-13-106.5(1)(c) .............................................................................................. 4, 5

Utah Code Ann. § 53-13-106.5(4)(a) ............................................................................................ 15, 17

Utah Code Ann. §§ 53-13-106.5(2) and (6) ................................................................... 4, 5, 6, 7, 9, 18

**Other Authorities**

63C Am. Jur. 2d Public Lands § 110 ........................................................................... 12

Allyson Barker, *The Role Of Collaborative Groups In Federal Land And Resource Management: A Legal Analysis*, 23 J. Land Resources & Envtl. L. 67, 89 (2003) ................................... 12, 14

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 112 (2012) ............................................................................................................................ 12

Bryan Kahr, *The Right to Exclude Meets the Right to Ride: Private Property, Public Recreation, and the Rise of Off-Road Vehicles*, 28 Stanford Envtl. Law J. 51, 67 (2009) ......................... 13

Dennis McLane, *Enforcement Authority under the Federal Land Policy and Management Act of 1976* at 52 (2001) ...................................................................................................... 6

George Cameron Coggins*, The Law of Public Range Land Management I:  The Extent and Distribution of Federal Power*, 12 Envtl. L. 535 (1982) ......................................................... 17

H.R. Rep. No. 94-1163, at 6189 ................................................................................... 14

Paul B. Smyth, *Federal Law Enforcement on Public Lands: Reality or Mirage?*, 21 Ariz L. Rev. 485, 494 (1979) .................................................................................................. 14, 16

## <u>INTRODUCTON</u>

During the 2013 Utah Legislative General Session, the Utah Legislature passed "The Federal Law Enforcement Amendments" ("H.B. 155").[1]  In passing H.B. 155, the Utah Legislature implicitly recognized the principle that "[t]he States are separate and independent sovereigns. Sometimes they have to act like it."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, —U.S.—, 132 S.Ct. 2566, 2603 (2012).  H.B. 155 seeks to strike a proper balance in the respective law enforcement roles of Utah and the United States on federal lands within the State.  *See id.* at 2578 ("[T]he National Government possesses only limited powers; the States and the people retain the remainder.").

Specifically, H.B. 155: (1) defines the extent to which federal agencies can enforce Utah Law on federal land; and (2) codifies the cooperative federalism embodied in the Federal Land Policy and Management Act of 1976 ("FLPMA") which carves out a role for the states in law enforcement on federal land.  This Court cannot invalidate H.B. 155 (and thereby upset the will of the people of the State of Utah), unless the United States can establish that the law violates the United States Constitution.

---

[1]  H.B. 155 was given a favorable recommendation by the House Natural Resources, Agriculture, and Environment Committee by a 9-3 vote.  *See* House Natural Resources, Agriculture, and Environment Committee Report, February 28, 2013 (copy attached hereto as Exhibit A).  It passed the Utah House of Representatives by a 61 to 8 vote and the Utah Senate by a 23 to 4 vote.  *See* House Vote H.B. 155 (March 4, 2013) (copy attached hereto as Exhibit B); Senate Vote H.B. 155 (March 13, 2013) (copy attached hereto as Exhibit C).  A copy of H.B. 155 has been attached to this Memorandum as Exhibit D.  On April 3, 2013, it was signed into law by Governor Gary R. Herbert with an effective date of May 14, 2013.  In order to allow the parties sufficient time to brief the issues raised by the United States' motion for preliminary injunction, the parties agreed to the issuance of a temporary restraining order staying the implementation of H.B. 155.  *See* Order Granting TRO (Dkt. No. 9).

On May 13, 2013, the United States filed a motion seeking to enjoin H.B. 155.  *See* U.S. Mot. TRO & Prelim. Inj. ("U.S. Mot.") (Dkt.  No. 3).  The gravamen of the United States' argument is that H.B. 155 violates the Supremacy Clause of the United States Constitution by "regulat[ing] federal agents in the performance of their federal duties, restrict[ing] the federal government's constitutional authority to use and manage federal land and property, and otherwise conflict[ing] with federal law."  (U.S. Mot. at 15 (Dkt. No. 3).)

The United States confronts a high burden when making a facial constitutional challenge to override a duly enacted Utah statute.  The United States cannot meet that burden if this Court appropriately construes H.B. 155.  H.B. 155 is an appropriate exercise of state legislative authority that does not violate the Supremacy Clause.  The United States cannot demonstrate that it will likely succeed on the merits of its claims or that it is likely to suffer irreparable harm if H.B. 155 goes into effect.  The request for a preliminary injunction should be denied.

## <u>LEGAL STANDARD</u>

"Because a preliminary injunction is an extraordinary . . . remedy, the right to relief must be clear and unequivocal."  *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994) (quotations and citation omitted) (alteration in original).  A party seeking a preliminary injunction bears the burden of showing: (1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued will not adversely affect the public interest.  *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1255 (10th Cir. 2003).

## ARGUMENT

### I.    THE UNITED STATES IS UNLIKELY TO PREVAIL ON THE MERITS.

The United States is unlikely to prevail on the merits of its declaratory judgment action because a review of H.B. 155 shows that it neither conflicts with federal law nor trespasses on the doctrine of intergovernmental immunity.  Therefore, the legislation is consistent with the Supremacy Clause.[2]

#### A.  The United States' Facial Challenge Burden.

The United States confronts a heavy burden to prevail on its facial challenge to H.B. 155. "We begin our review with the venerable presumption that the acts of a state legislature are constitutional." *Villanueva v. Carere*, 85 F.3d 481, 487 (10th Cir. 1996).  The United States Supreme Court in *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008), reviewed the many reasons why facial attacks are disfavored.  Each reason resonates here.

First, facial attacks "often rest on speculation.  As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records." *Id.* at 450 (quotations and citation omitted).  Second, they "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (quotations and citations omitted).  Finally, facial attacks "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. . . . [A]

---

[2]  "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2.

ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Id.* at 451 (citations omitted).  Consequently, "a plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' i.e., that the law is unconstitutional in *all* of its applications." *Id.* at 449 (emphasis added) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  The United States cannot meet that substantial burden here.[3]

**B.  H.B. 155 is Consistent with the Supremacy Clause.**

H.B. 155 is a valid exercise of state power under the Supremacy Clause.  H.B. 155 does not conflict with federal law nor interfere with the federal government's functions under the Property Clause.[4]  Nor does the legislation violate the doctrine of intergovernmental immunity.

Under a preemption analysis, courts assume "that the historic police powers of the States were not to be superseded by the Federal Act" unless Congress clearly provided otherwise. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).  "[I]n the absence of express preemptive language, federal courts should be reluctant to infer pre-emption." *United States v. Vasquez-Alvarez*, 176 F.3d 1294, 1297 (10th Cir. 1999), *cert. denied*, 528 U.S. 913 (1999).

---

[3]  Moreover, when reviewing the constitutionality of a state statute, federal courts may "only consider the statute's plain meaning and authoritative state court constructions of the statute." *Cotton States Mut. Ins. V. Anderson*, 749 F.2d 663, 667 (11th Cir. 1984).  The Utah Supreme Court similarly reviews whether a statute is constitutional as "a question of law" presuming that "the legislation being challenged is constitutional" resolving "any reasonable doubts in favor of constitutionality." *Utah v. Drej*, 233 P.3d 476, 480 (Utah 2010).  When determining the "true intent and purpose" of the Utah Legislature concerning a statute, the best evidence is the plain language of the statute itself and the legislative history of a statute is consulted only when the statutory language is ambiguous and susceptible to two or more reasonable interpretations. *Marion Energy, Inc. v. KFJ Ranch P'Ship*, 267 P.3d 863, 866-67 (Utah 2011).

[4]  "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or any particular State." U.S. Const. art. IV, § 3, cl. 2.

Preemption can take two forms: express or implied from a statute's structure and purpose. *Vasquez-Alvarez*, 176 F.3d at 1297 (quotations and citation omitted).  Express preemption occurs if Congress explicitly declares that its law shall have preemptive effect. *Id.*  Implied preemption occurs if: (1) "the federal regulatory scheme is so pervasive as to create the inference that Congress meant to leave no room for the states to supplement it" (referred to as field preemption), or (2) "compliance with both state and federal law is impossible or state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (referred to as conflict preemption).  *Id.* at 1297 n.3 (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)).

Because "federal preemption of a state law is strong medicine, . . . [it] is not casually to be dispensed." *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 75 (1st Cir. 2001) (quotations and citations omitted), *aff'd sub nom. Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644.  "This is especially true when the federal statute . . . utilizes 'cooperative federalism': '[w]here coordinated state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal preemption becomes a less persuasive one.'"  *Id.* (citing *Wash. Dep't of Soc. & Health Servs. v. Bowen,* 815 F.2d 549, 557 (9th Cir.1987) (quoting *N.Y. Dep't of Soc. Servs. v. Dublino,* 413 U.S. 405, 421 (1973))).

The United States can establish neither preemption nor violation of the doctrine of intergovernmental immunity because H.B. 155 is consistent with federal law and the United States Constitution.   First, H.B. 155 places appropriate limits on the ability of DOI and the United States Department of Agriculture ("USDA") to enforce Utah law via administrative regulations.  Second, H.B. 155 codifies portions of FLPMA, a statute grounded in the principles of cooperative federalism and that expressly provides for a state law enforcement role on lands

3

managed by the Department of the Interior ("DOI") when such assistance is necessary.  *See* 43 U.S.C. § 1733(c).  For these reasons, this Court should uphold H.B. 155 and deny the United States' motion.

**1.     Utah Code Ann. §§ 53-13-106.5(2) and (6) Properly Restrict DOI and USDA Employees from Co-opting Utah Law Enforcement Authority.**

Utah Code Ann. §§ 53-13-106.5(2) and (6) prevent employees of the DOI, and non-law enforcement employees of the USDA,[5] from co-opting authority to enforce Utah law via federal administrative regulation.  Utah agrees with the United States' observation that "the federal government retains the authority to enforce federal law [on federal land] at all times."  (U.S. Mot. at 4 (Dkt. No. 3).)  But Utah Code Ann. §§ 53-13-106.5(2) and (6) present a different issue: whether the DOI and the USDA may properly co-opt enforcement of Utah law on federal land by adopting state law standards through their rule-making powers.

The DOI and the USDA cannot grant to themselves state law enforcement authority under the relevant federal statutes, therefore Utah Code Ann. §§ 53-13-106.5(2) and (6) are not subject to preemption nor do they violate the doctrine of intergovernmental immunity.  H.B. 155 merely restates Utah's authority, pursuant to its inherent police powers, to define state law and also to determine who may enforce that law.  Such decisions are properly left to the states and not to federal administrative agencies.

---

[5]  The United States argues that Utah Code Ann. § 53-13-106.5(6) requires USDA Forest Service employees to be certified under state law.  This is incorrect.  The requirement is that Forest Service employees be "trained and certified law enforcement officer[s]."  Utah Code Ann. § 53-13-106.5(6).  The statute does not dictate that Forest Service employees must be certified under Utah law, rather, the statute merely recognizes Utah's interest in ensuring that those who enforce its laws are capable of doing so.  It is significant that H.B. 155 implicitly agrees with the sufficiency of federal training, since it expresses no concern with regard to the enforcement of adopted Utah law by agents of the FBI, Secret Service, Homeland Security, DEA, and other agencies.  *See* Utah Code Ann. § 53-13-106.5(1)(c).

4

Federal regulations can have the same preemptive effect as federal statutes.  *La. Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 369 (1986).  But a regulation only has preemptive effect on state legislation if the "federal agency [is] acting within the scope of its congressionally delegated authority."  *See id.*  The DOI and the USDA have exceeded the scope of their congressionally delegated authority by seeking to enforce state law through agency regulations.[6]

### a.  Congress Did Not Grant the DOI Authority to Unilaterally Enforce Utah Law.

The enforcement powers of various divisions of the DOI are defined by several federal statutes, including: FLPMA, the National Park Service Organic Act of 1916, as well as statutes applicable to the Fish and Wildlife Service ("FWS") and the Bureau of Reclamation ("BOR").[7] None allows DOI employees to assume authority to enforce state law through enactment of regulations.

### i.  FLPMA.

FLPMA gives BLM employees authority to "enforc[e] *Federal* laws and regulations relating to public lands and their resources." 43 U.S.C. § 1733(c) (emphasis added).

---

[6]  The United States cites several cases in support of the proposition that "there is little question that federal regulations may incorporate state law standards."  (U.S. Mot. at 29-30 (Dkt. No. 3).) However, these cases are inapposite.  None deals with the precise question presented here: whether the DOI and the USDA can co-opt enforcement of state law via regulation where such attempts are explicitly prohibited by state law and outside the scope of agency rule-making authority.  Further, none of the cases cited is a Tenth Circuit Court of Appeals decision, or a United States Supreme Court Decision, thus is not binding on this Court.  *Cf. Kleppe v. New Mexico*, 426 U.S. 529 (1976) (notes Congress' broad authority under the Property Clause to make legislation governing federal land, but is silent on the question presented here of the scope of an agency's rule-making authority pursuant to an act of Congress).

[7]  Utah Code Ann. § 53-13-106.5(2) applies to all employees of the DOI and the USDA Forest Service, while Utah Code § 53-13-106.5(6) applies exclusively to BLM and Forest Service employees.  *See* Utah Code Ann. § 53-13-106.5(1)(c) (defining "federal employee" as used in section 106.5(2)).

Significantly, under FLPMA, state and local officials retain enforcement authority over state law on public lands, with BLM employees allowed to fill a "cooperat[ive]" role only with the consent of such officials:

> In connection with the administration and regulation of the use and occupancy of the public lands, the Secretary is authorized to cooperate with the regulatory and law enforcement officials of any State or political subdivision thereof in the enforcement of the laws or ordinances of such State or subdivision. Such cooperation may include reimbursement to a State or its subdivision for expenditures incurred by it in connection with activities which assist in the administration and regulation of use and occupancy of the public lands.

43 U.S.C. § 1733(d).   This arrangement suggests that the intent of Congress was to restrict DOI employees from enforcing state and local laws on federal land.[8]  DOI efforts to circumvent this restriction by incorporating state law standards into its regulations, without the consent of the state, go beyond congressionally delegated authority.  Such regulations are invalid and do not preempt Utah Code Ann. §§ 53-13-106.5(2) and (6).

### ii.    National Park Service Organic Act of 1916.

Next, the National Park Service Organic Act of 1916, authorizes designated NPS employees to arrest for "any offense committed against the United States" in their presence or for felonies "under the laws of the United States."  16 U.S.C. § 1a-6(b)(1).  Like BLM employees, NPS employees possess only express statutory authority to enforce *federal* law.

---

[8]  Legislative history supports this view.  Prior to the enactment of FLPMA, proposed legislation would have granted broad enforcement authority to BLM employees including the ability to make arrests under federal and state law.  *See* Dennis McLane, *Enforcement Authority under the Federal Land Policy and Management Act of 1976* at 52 (2001) (copy attached hereto as Exhibit E) (discussing House Bill 7211 which would have permitted BLM enforcement of "State crime[s] or common law crime[s] on Federal land").  That Congress ultimately approved FLPMA without such broad grants of authority suggests that such grants do not exist under FLPMA.  *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 223 (2009) ("[S]tatutory silence, when viewed in context, is best interpreted as limiting agency discretion." (citing *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 121 (2001)).

Moreover, as with FLPMA, the National Park Service Organic Act of 1916 encourages NPS to "cooperate" with state and local officials with regard to "the enforcement of supervision of the laws or ordinances of that State."  16 U.S.C. § 1a-6(c)(2).

This statutory scheme recognizes the primacy of a state's authority to enforce its own laws.  Thus, the National Park Organic Act of 1916 provides no authority for NPS to incorporate and enforce state law via regulation without a state's consent.

### iii.    Statutes Governing FWS.

FWS has a specialized mission to ensure "the conservation and restoration of fish, wildlife, plants, and their habitats."  (U.S. Mot. at 8 (Dkt. No. 3).)  To assist with this mission, FWS has been granted authority to enforce federal law relating to those conservation objectives. 16 U.S.C. § 668dd(g).  Nothing in the federal statutory scheme suggests Congress intended to authorize DOI to promulgate regulations allowing FWS to also enforce state law.  In the absence of such authority, the FWS regulations adopting state law standards do not preempt Utah Code Ann. § 53-13-106.5(2) .

### iv.    Statutes Governing BOR.

The United States Code also authorizes designated BOR employees "to enforce *Federal* laws and regulations within a Reclamation project or on Reclamation lands."  43 U.S.C. § 373b(c)(1) (emphasis added).  But, like other DOI employees, the enforcement authority Congress gave to BOR employees extends exclusively to federal law.  Similar to the statutes governing the BLM and NPS, the primacy of a state's authority to enforce its own laws is recognized in the BOR statute, which allows BOR to "cooperate with any State or local government . . . in the enforcement of laws or ordinances of that State or local government."  43

U.S.C. § 373b(c)(1).  Cooperation necessarily precludes DOI from unilaterally enforcing state law without a state's approval, including through administrative regulation.

Nothing in the BOR statutory scheme, or those statues applicable to the BLM, NPS, and FWS, suggests that Congress authorized DOI to enforce state law through its rule-making powers absent the consent of states.  Rather, it appears Congress intended for states to maintain authority to enforce their own laws.  Accordingly, sections 106.5(2) and 106.5(6) are valid exercises of state authority and are not preempted by any DOI regulation.

### b. Congress Did Not Grant the USDA Authority to Unilaterally Enforce Utah Law.

Finally, regulations governing the USDA are also limited.  There, Congress provided that "all persons employed in the Forest Service . . . shall have authority to make arrests for the violation of the laws and regulations relating to the national forests."  16 U.S.C. § 559.  The "laws and regulations relating to the national forests" are necessarily comprised exclusively of federal laws and regulations.  Congress granted no authority to the USDA to promulgate rules allowing enforcement of state laws.

The statute also contains a provision authorizing cooperation between state law enforcement and the Forest Service.  See 16 U.S.C. § 559g(c).  The provision allows a Forest Service employee to accept a state's offer of law enforcement designation "for the purpose of cooperating in the investigation and enforcement of any . . . State law or ordinance . . . when such . . . is mutually beneficial."  Id.  One implication of this provision is that Congress did not intend for the Forest Service to unilaterally assume state law enforcement authority.  Congress recognized that enforcement of state law is the domain of the states and that the states must

designate Forest Services employees to perform such functions. Accordingly, Congress did not

authorize the USDA to enforce state law through regulation.

An examination of the "structure and purpose of the [federal] statute[s] as a whole,"

demonstrates that the DOI and the USDA lack authority to co-opt enforcement of Utah law by

administrative regulation without Utah's consent. *See Gade,* 505 U.S. at 98. Through Utah

Code Ann. §§ 53-13-106.5(2) and (6) Utah has retained for itself the power to say who may

enforce Utah law. Federal regulations seeking to co-opt that power are invalid exercises of rule-

making authority and do not preempt Utah Code Ann. §§ 53-13-106.5(2) and (6).

> **2.** **Utah Code § 53-13-106.5(4) Does Not Place Restrictions on DOI or Conflict with Federal Law by Imposing Unwarranted Restrictions on the DOI's Management of Federal Lands**.

Utah Code § 53-13-106.5(4) as amended by H.B. 155 states:

(4)(a) Utah does not recognize the authority of employees or agents of the United States Department of Interior to exercise law enforcement powers in any county when the exercise of the authority:

> (i) occurs before the United States Secretary of the Interior has achieved the maximum feasible reliance upon the county's law enforcement officials in enforcing federal laws and regulations for the management, use, and protection of lands managed by the United States Bureau of Land Management, *as required under 43 U.S.C. §. 1733(c)(2)*; or

> (ii) goes beyond those powers strictly necessary for the management, use, and protection of federally managed lands, including property located on these lands, *as limited by 43 U.S.C. §. 1733(a).*

(b) *As required by Congress in 43 U.S.C. §. 1733(c)(1)*, when the Secretary of Interior determines that state or local assistance is necessary in enforcing federal laws and regulations relating to federally managed lands or the resources on those lands, the secretary shall offer a contract to appropriate state or local law enforcement agencies of the state with the purpose of achieving maximum feasible reliance upon state or local law enforcement officials in enforcing the federal laws and regulations.

(emphasis added).

The Utah Legislature has taken Utah Code § 53-13-106.5(4) as amended by H.B. 155 and essentially restated via state statute the requirement that the DOI exercise law enforcement on Bureau of Land Management ("BLM") lands through FLPMA found at 43 U.S.C. § 1733.

### a.  H.B. 155 Subsections (4)(a)(i) & (4)(b)

In FLPMA, Congress clearly indicated that:  "The Secretary [of the Interior] may authorize Federal Personnel *or appropriate local officials* to carry out [her] law enforcement responsibilities with respect to the public lands and their resources."  43 U.S.C. § 1733(c)(2) (emphasis added).  Section 1733(c)(2) then points back to section 1733(c)(1) indicating: "Such designated personnel shall receive the training and have the responsibilities and authority provided for in paragraph (1) of this subsection."  *Id*.  Section 1733(c)(1) indicates:

> When the Secretary determines that assistance is necessary in enforcing Federal laws and regulations relating to the public lands or their resources [s]he shall offer a contract to appropriate local officials having law enforcement authority within their respective jurisdictions with the view of achieving maximum feasible reliance upon local law enforcement officials in enforcing such laws and regulations. The Secretary shall negotiate on reasonable terms with such officials who have authority to enter into such contracts to enforce such Federal laws and regulations. In the performance of their duties under such contracts such officials and their agents are authorized to carry firearms; execute and serve any warrant or other process issued by a court or officer of competent jurisdiction; make arrests without warrant or process for a misdemeanor he has reasonable grounds to believe is being committed in his presence or view, or for a felony if he has reasonable grounds to believe that the person to be arrested has committed or is committing such felony; search without warrant or process any person, place, or conveyance according to any Federal law or rule of law; and seize without warrant or process any evidentiary item as provided by Federal law. The Secretary shall provide such law enforcement training as [s]he deems necessary in order to carry out the contracted for responsibilities. While exercising the powers and authorities provided by such contract pursuant to this section, such law enforcement officials and their agents shall have all the immunities of Federal law enforcement officials.

43 U.S.C. § 1733(c)(1).

H.B. 155 restates or mimics these FLPMA requirements at subsection (4)(a)(i), and H.B. 155 again parrots the language from FLPMA cited above in subsection (4)(b).  Here, the fact that the Utah Legislature has chosen to parrot or mimic the requirements of FLPMA in H.B. 155 should not raise a constitutional infirmity at the preliminary injunction phase, and more to the point, does not affirmatively evidence that the United States has any likelihood of success on the merits.  *See Treacy v. Newdunn Associates, LLP*, 344 F.3d 407 at n.2 (4th Cir. 2003) ("The fact that a state law might mimic the wording of a federal law, of course, does not transform interpretation of the state statute into a federal question.").

The United States argues that H.B. 155 "misstates the scope of federal statutes, ignores other applicable federal laws, and attempts to convert a discretionary authority of the Secretary of the Interior into a necessary precondition to the exercise of federal authority within the state." (U.S. Mot. at 25 (Dkt.  No. 3).)  The United States claims that such restrictions "frustrates Congress' purposes in managing and administering federal property." (*Id*.)  The United States contends that H.B. 155 "convert[s] a discretionary authority that Congress has granted to the Secretary into a mandatory obligation."  (*Id*.)  However, a review of FLPMA and the declarations submitted by the United States shows that the claimed discretionary determination of whether or not the assistance of local authorities is necessary has likely already been made.  "When the Secretary *determines that assistance is necessary* in enforcing Federal laws and regulations relating to the public lands or their resources *[s]he shall offer a contract to appropriate local officials* having law enforcement authority within their respective jurisdictions with the view of achieving maximum feasible reliance upon local law enforcement officials in enforcing such laws and regulations."  43 U.S.C. § 1733(c)(1) (emphasis added).

The United States argues that the language prior to the word "shall" creates a discretionary situation for the Secretary of DOI ("Secretary").  (*See* U.S. Motion at 13 (Dkt.  No. 3).)  However, it cannot be disputed that the use of the word "shall" "normally creates an obligation impervious to judicial discretion."  *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (citation omitted); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 112 (2012) ("The traditional, commonly repeated rule [of statutory interpretation] is that 'shall' is mandatory. . . .").  The intent of Congress is clear that once it has been determined that local assistance is necessary, the remaining contracting obligation found in Section 1733(c)(1) shall be undertaken by the Secretary.  *See* 63C Am. Jur. 2d Public Lands § 110 ("Having determined that assistance is needed to enforce federal laws and regulations relating to public lands or their resources, the Secretary of the Interior must offer a contract to appropriate local officials in order to achieve the maximum feasible reliance upon local law enforcement officials in enforcing such laws and regulations.").  FLPMA's provisions "suggest that Congress intended, even required, the Secretary of the Interior to take steps to involve nonfederal entities in the execution of FLPMA's statutory responsibilities."  Allyson Barker, *The Role Of Collaborative Groups In Federal Land And Resource Management: A Legal Analysis*, 23 J. Land Resources & Envtl. L. 67, 89 (2003).

The only discretionary language given by the United States Congress used in 43 U.S.C. § 1733(c)(1) is "[w]hen the Secretary determines that assistance is necessary in enforcing Federal laws and regulations relating to the public lands or their resources *[s]he shall . . .*".  43 U.S.C.  § 1733(c)(1) (emphasis added).  The United States has provided evidence that the Secretary has utilized local assistance in enforcing federal laws and regulations on BLM land, making mandatory the remainder of 43 U.S.C. § 1733(c)(1): "contract[ing] to appropriate local officials

12

having law enforcement authority within their respective jurisdictions."  For example, the United States indicates that "[s]ince most BLM LEO contacts take place in remote or backcountry areas, a BLM LEO typically has no readily available back-up[.]"  (U.S. Mot., Ex. 4, Boik Decl. at 13, ¶ 28 (Dkt. No. 3-4)).)

Moreover, the cooperative arrangements between non-BLM divisions of DOI and local law enforcement supports the idea that such arrangements are necessary on federal lands in Utah generally, including BLM land:

- "These agreements are mutually beneficial to local agencies and the NPS and allow for coordinated public service."  (U.S. Mot., Ex. 2, Shott Decl. at 12, ¶ 27 (Dkt. No. 3-2)).)[9]

- "FWS and other Interior LEOs working in Utah are regularly supported, and provide support for, state and local law enforcement agencies."  (U.S. Mot., Ex. 3, Mullin Decl. at 9, ¶ 22 (Dkt. No. 3-3)).)

Further evidence is also available that local law enforcement is not only necessary, but sometimes it is the only available response in the western United States to assist with the enforcement of federal or local laws.  *See* Bryan Kahr, *The Right to Exclude Meets the Right to Ride: Private Property, Public Recreation, and the Rise of Off-Road Vehicles*, 28 Stanford Envtl. L.J. 51, 67 (2009) ("Mark's calls to the responsible law enforcement authority (the BLM for illegal riding on public lands and the San Bernardino County Sheriff's Department for violations

---

[9] The National Park Service ("NPS"), in particular, appears to have forged successful partnerships with local law enforcement in Utah.  DOI should extend this success to BLM lands. *See* (U.S. Mot., Ex. 2, Shott Decl. at 9, ¶ 20 (Dkt. No. 3-2)): "Zion has a Mutual Aid Agreement with the neighboring town of Springdale to provide support for law enforcement, emergency medical services, and fire services[;]" At 10, ¶ 23: "Wayne County and the NPS share traffic enforcement duties on the 15 miles of State Highway 24 on federal land within the [Capital Reef National Park;]" At 11-12, ¶ 27: "NPS units in Utah currently have 11 Memoranda of Understanding (MOUs) regarding law enforcement with 7 counties in Utah, one MOU regarding law enforcement within a city, and Bryce National Park has 4 NPS officers deputized in Garfield County, Utah."

on private land) bring little relief, as the standard response time to calls from remote Wonder Valley for Sheriff's deputies is more than two hours and it can occasionally take days for a deputy to respond.  BLM rangers do not respond at all.").

Independent of H.B. 155, therefore, the principles of cooperative federalism found in FLPMA obligate the Secretary to "offer a contract to appropriate local officials having law enforcement authority within their respective jurisdictions with the view of achieving maximum feasible reliance upon local law enforcement officials in enforcing such laws and regulations." 43 U.S.C. § 1733(c)(1); *see* Paul B. Smyth, *Federal Law Enforcement on Public Lands: Reality or Mirage?*, 21 Ariz. L. Rev. 485, 494 (1979) (FLPMA "reflects a strong congressional preference that public lands be patrolled by local officers rather than federal personnel."). Certainly, Congress expected that "the Secretary of the Interior [would] construe this authority broadly, for the purpose is to provide financial assistance to States and their subdivisions where the existence of large areas of public lands deprives the governmental entity of adequate enforcement of laws and ordinances as they apply to the public lands."  H.R. Rep. No. 94-1163, at 6189.

To this end, "[t]he legislative history shows that Congress recognized the importance of local knowledge and expertise in certain areas of land management, and intended the Secretary of the Interior to utilize the expertise of state and local governments, as well as the public, when it would help to promote the goals of FLPMA."  Barker, *Collaborative Groups, supra*, at 89. Those goals include "fire prevention and suppression, *law and regulation enforcement*, supervision of the range especially in intermingled land areas, and construction of facilities;" all tasks that local government entities can and do competently perform.  *Id*. (emphasis added).  The United States Congress, therefore, intended the Secretary be authorized and required to utilize

14

local law enforcement with the purpose of achieving "maximum feasible reliance" on local law enforcement in enforcing federal laws and regulations and state laws, on federal lands "when assistance is necessary." H.B. 155 simply mirrors that intent.

Because contracting with state or local law enforcement agencies has already been determined "necessary" in some areas within Utah, H.B. 155's subsection (4) does nothing more than restate FLPMA's Congressional mandate to the Secretary, and it is not an unconstitutional limitation of DOI's management of federal lands. Here, a declaration finding Utah Code § 53-13-106.5(4) unconstitutional is unwarranted and would have no effect because DOI would still be under the requirements of FLPMA found in 43 U.S.C. § 1733(c). A state statute should not be held to be unconstitutional simply because it restates requirements already found in existing federal law. Nor should it be held unconstitutional where, as here, the State of Utah has not only demonstrated the statute's validity, it has shown that the United States is already independently bound by the requirements set forth in section 53-13-106.5(4).

### b. H.B. 155 Subsection (4)(a)(ii)

Contrary to Plaintiff's claim, H.B. 155 does not "frustrate[] Congress' purposes in managing and administering federal property." H.B. 155 parrots in part the language found in FLPMA and only restricts the exercise of "law enforcement powers" that are outside of FLPMA's grant of authority and "beyond those powers strictly necessary for the management, use, and protection of federally managed lands." *See* Utah Code Ann. § 53-13-106.5(4)(a). This language makes it clear that the Utah Legislature intends on leaving the traditional "management, use, and protection of federally managed lands" to the federal government as provided by the United States Constitution, federal statutes including FLPMA, and the principle of cooperative federalism found in each.

15

For instance, any criminal violation under FLPMA must be "knowing" and "willful" because Congress intended the role of BLM employees acting as law enforcement would be to educate the public about the law and to provide assistance with enforcing the law.  *See* H.R. Rep. No. 94-1724, at 6232.  "The knowing and willful requirement arguably necessitates proof that the defendant knew he committed an unlawful act on public lands."  Smyth, *Reality or Mirage?*, *supra*, at 491.  FLPMA therefore places a more restrictive enforcement authority on DOI employees than that placed on traditional law enforcement agencies.

For example, over one-hundred years ago, the United States Supreme Court recognized that "[f]rom the various acts relating to the establishment and management of forest reservations, it appears that they were intended to improve and protect the forest and secure favorable conditions of water flows."  *United States v. Grimaud*, 220 U.S. 506, 516-21 (1911) (recognizing that while Congress conferred administrative functions on the Secretary of the Agriculture, Congress did not, and cannot, delegate legislative powers to the Secretary).  Congress even intended through FLPMA that: "Criminal prosecutions and penalties should be remedies of last resort.  Emphasis should be given to the dissemination of information, the creation of a law-enforcement presence which will advise the public, and administrative resolution of violations rather than prosecution in the courts."  H.R. Rep. No. 94-1163 at 6189.

"Traditionally, basic law enforcement has been considered a function of state and local governments and, generally speaking, most major categories of public and private offenses are adequately covered by state law."  Smyth, *Reality or Mirage?*, *supra* 486 (recognizing that "Strong feelings of many western citizens concerning enforcement of laws by BLM personnel created a highly sensitive political issue.").  "[T]he Interior Department has been inclined to continue the traditional approach."  *Id*. at 491 (citing Memorandum from the Assistant Secretary,

Land and Water Resources to the Director, BLM (January 10, 1978)).  "The states, [] by virtue of their sovereignty, are still able to exercise wide-ranging control under the rubric of 'police power.'  Most rules that govern everyday life, from traffic regulations to health and safety codes to education and zoning, have their origin in state law."  George Cameron Coggins, *The Law of Public Range Land Management I:  The Extent and Distribution of Federal Power*, 12 Envtl. L. 535, 599 (1982).[10]  Also, the United States Supreme Court has long held that "the state . . . shall not, by reason of the establishment . . . [of the public forest reservations] lose its jurisdiction[.]"  *United States v. Grimaud*, 220 U.S. 506, 507 (1911).  "Principles of federalism sharply delimit the authority of the federal sovereign to interfere with a state's police power."  *U.S. v. Snyder*, 852 F.2d 471, 475 (9th Cir. 1988).

Here, the Utah Legislature is memorializing via state statute, in language that parrots the existing state statute found at Utah Code § 53-13-106.5(4)(a), the concept of cooperative federalism.  H.B. 155 at subsection (4)(a)(ii) codifies that the traditional and proper course of law enforcement, as Congressionally mandated, should be followed on federal lands in Utah.   And that of course contemplates that local and municipal law enforcement agencies are the traditional sources of enforcement of state criminal codes, and that the FBI, ATF, and DEA, which are exempted from H.B. 155, are the traditional sources of enforcement for federal criminal violations.  Subsection (4)(a)(ii) does nothing more than statutorily recognize these distinctions and limitations.

---

[10]  *See U.S. v. Jones*, 428 F. Supp.2d 497 (W.D. Va. 2006) (holding that "park rangers are permitted to make arrests without a warrant for any offense against the United States committed in his presence only if such arrest occurs within the park system or if the person to be arrested is fleeing from that park system to avoid arrest.").

## II.   THE UNITED STATES WILL NOT SUFFER IRREPARABLE HARM.

"[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004).  According to the United States Supreme Court, "[o]ur frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat'l Resources Def. Council, Inc.,* 555 U.S. 7, 22 (2008)(citations omitted).

"To constitute irreparable harm, an injury must be certain, great, actual and not theoretical.  Irreparable harm is not harm that is merely serious or substantial." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quotations and citations omitted). Moreover, hypothetical subjective fears cannot form the basis for a claim of likely, significant, irreparable harm.  *Laratta v. McCormac*, 2010 WL 3341282, *3 (D. Colo. 2010) (unpublished).

The United States argues that permitting the enforcement of H.B. 155 "will subject Forest Service and BLM officers to an imminent risk that they will be criminally charged or arrested for performing their law enforcement duties."  (U.S. Mot. at 33 (Dkt. No. 3).)  However, the United States is asserting harm that is "hypothetical" compared to harm that is "certain, great, [and] actual."  As argued above, H.B. 155 seeks not to restrict properly granted authority to federal employees, but simply defines the parameters of valid authority as granted by federal law.  *See* Utah Code Ann. § 53-13-106.5(6) (defining the scope of federal authority to enforce Utah law). The standard for this Court is not whether there is a potential for misapplication of H.B. 155, but instead whether "no set of circumstances exists under which the Act would be valid."  Federal

employees performing their law enforcement duties under a system of cooperative federalism will face no "imminent risk that they will be criminally charged or arrested."[11]

## III.   THERE IS NO THREATENED INJURY AND AN INJUNCTION WILL BE ADVERSE TO THE PUBLIC INTEREST.

Finally, the Court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. . . . pay[ing] particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. Because the United States seeks to enjoin the State they must "contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs." *Allen v. Wright*, 468 U.S. 737, 761 (1984) (holding that the plaintiffs lacked standing) (quotations and citation omitted). Accordingly, the Court "must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *Rizzo v. Goode*, 423 U.S. 362, 378 (1976) (concluding that plaintiffs did not have standing) (quotations and citation omitted).

Sixty-one Utah representatives, twenty-three Utah Senators, and Governor Gary R. Herbert approved of H.B. 155. These individuals are duly elected by the citizens of Utah and, accordingly, appropriate deference should be given to their enactments. A review of H.B. 155

---

[11]   Should the Court determine that any part of H.B. 155 is invalid, such provision should be severed from the remainder of the legislation. "A statute bad in part is not necessarily void in its entirety. Provisions within the legislative power may stand." *Dorchy v. State of Kansas*, 264 U.S. 286 (1924); *see Guste v. Jackson*, 429 U.S. 399 (1977) (per curiam) (remanding to district court to consider statue's severability). "In Utah, the [severability] test is 'whether the legislature would have passed the statute without the objectionable part.'" *American Target Advertising, Inc. v. Giani*, 199 F.3d 1241, 1250 (10th Cir. 2000) (citing *Stewart v. Utah Pub. Serv. Comm'n*, 885 P.2d 759, 779 (Utah 1994) (quoting *Union Trust Co. v. Simmons*, 116 Utah 422, 211 P.2d 190, 193 (1949))).

shows that, properly construed, it does not conflict with federal law or trespass on the doctrine of intergovernmental immunity.  When considering the high standard needed to have an injunction issued (a substantial likelihood of prevailing on the merits concerning a statute which is already presumed to be constitutional), issuance of a preliminary injunction would have an adverse effect on the public interest preserving the balance between the respective powers of the states and the Federal government.

## CONCLUSION

A preliminary injunction should not be issued in the present case because the United States has failed to demonstrate that an injunction is necessary and that its right to relief is "clear and unequivocal."  The United States has failed to demonstrate that it is likely to prevail on the merits of its declaratory judgment action because: (1) a review of Utah Code § 53-13-106.5 as amended by H.B. 155 shows that it does not preempt federal law and/or the United States Constitution; (2) the United States will not suffer irreparable harm; and (3) there is no threatened injury to the United States.  But, it would be against the public interest to enjoin implementation of H.B. 155 as enacted.

Dated this 4th day of June, 2013.

JOHN E. SWALLOW
Attorney General

/s/ Paul H. Tonks
PAUL H. TONKS
MEB W. ANDERSON
Assistant Utah Attorneys General
Attorneys for Defendants State of Utah and
Utah Governor Gary R. Herbert

20