STUART F. DELERY
Acting Assistant Attorney General
DAVID B. BARLOW (Bar #13117)
United States Attorney
CARLIE CHRISTENSEN (Bar #633)
JEANNETTE F. SWENT (Bar #6043)
Assistant United States Attorneys
ARTHUR R. GOLDBERG
Assistant Director, Federal Programs Branch
RYAN PARKER (Bar # 11742) *
SCOTT RISNER (MI Bar #P70762) *
Trial Attorneys
Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC 20001
Telephone:      (202) 514-2395
Facsimile:      (202) 616-8470
E-mail:         scott.risner@usdoj.gov

Attorneys for the United States

*Admitted *pro hac vice*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| The United States of America,<br><br>Plaintiff,<br><br>v.<br><br>The State of Utah; and Gary R. Herbert, Governor of the State of Utah, in his official capacity,<br><br>Defendants. | Case No. 2:13-CV-00332-DN<br><br><br>**UNITED STATES' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 3

I.     THE UNITED STATES IS LIKELY TO PREVAIL ON THE MERITS OF ITS CHALLENGE TO SECTIONS 53-13-106.5 AND 76-8-512(4) ................... 3

    A.    The Utah Laws Violate the Doctrine of Intergovernmental Immunity....... 3

    B.    The Utah Laws Conflict With Federal Law and Are Thus Preempted....... 6

        1.    Sections 53-13-106.5(2) and (6) Conflict With Federal Law ......... 7

        2.    Section 53-13-106.5(4) Conflicts With Federal Law ................... 13

        3.    Section 76-8-512(4) Conflicts With Federal Law ....................... 16

    C.    The United States Has Satisfied the Requirements for a Facial Challenge ................................................................................................ 17

II.    IMPLEMENTATION OF SECTIONS 53-13-106.5 AND 76-8-512(4) WILL IRREPARABLY HARM THE UNITED STATES AND BURDEN THE PUBLIC INTEREST ................................................................................... 19

CONCLUSION..................................................................................................................... 20

<u>UNITED STATES' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR</u>
<u>PRELIMINARY INJUNCTION</u>

## INTRODUCTION

A state may not restrict the federal government's exercise of authority on federal land.

Yet that is precisely what the State of Utah has attempted to do through its enactment of Sections

53-13-106.5 and 76-8-512(4) of the Utah Code.  As recently amended by HB 155, Section 53-

13-106.5 purports to deny certain employees of the Department of the Interior (DOI) and the

Department of Agriculture (USDA) the ability to exercise federal law enforcement authority

unless they comply with conditions imposed by Utah.  Section 76-8-512(4) seeks to fortify that

prohibition with the threat of criminal sanctions.  To prevent the irreparable harm that would

result from the implementation of these provisions, the United States has moved for a

preliminary injunction.[1]

The United States' motion explained that, by their very terms, Sections 53-13-106.5 and

76-8-512(4) violate the principle of intergovernmental immunity, which prohibits a state or local

law from directly regulating a federal function or discriminating against the United States.  In

response, the State of Utah says only that the state's laws are consistent with federal law.  *See*

Defs.' Opp'n 3.  Even if that were true (and it is not), "there is no exception to the doctrine of

intergovernmental immunity for state statutes consistent with federal law."  *United States v. City*

*of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010).  Utah has failed to reference any authority

suggesting that a state may impose these types of penalties on federal functions and, in fact,

federal courts have consistently held that such state laws are unconstitutional.

---

[1] On May 13, 2013, the Court entered a temporary restraining order enjoining the enforcement of Sections 53-13-106.5 and 76-8-512(4).  By consent of the Defendants, that order shall remain in effect unless and until the Court orders otherwise.  *See* Dkt. 9.

The United States' motion also explained that Sections 53-13-106.5 and 76-8-512(4) are preempted by federal law because they stand as an obstacle to various enumerated statutes which vest DOI and USDA with the authority to promulgate and enforce rules and regulations regarding the use and protection of federal lands.  In response, Utah contends that it may prohibit the federal government from exercising law enforcement authority "on federal land by adopting state law standards through their rule-making powers." Defs.' Opp'n 4.  The State offers no legal authority whatsoever for that argument.  Instead, the State spends several pages arguing a different issue: that the federal government may not "unilaterally enforce Utah law." *Id.* at 5-9. The issues presented in this case do not, however, concern the enforcement of Utah law, but rather the enforcement of federal law (including federal regulations that adopt standards from the law of the state in which federal land is located).  By focusing on the wrong question, Utah renders its opposition largely non-responsive to the United States' arguments.

Utah's attempt to distort the issue should not mask its failure to address the preemption arguments actually made by the United States.  The United States identified specific statutes in which Congress gave DOI and USDA broad authority to issue regulations to manage and protect federal lands.  *See, e.g.*, 16 U.S.C. § 551; 43 U.S.C. § 1733(a).  These are the statutes that give rise to preemption in this case, yet Utah's response ignores them.  The United States also identified numerous regulations that the agencies have adopted, including regulations that apply standards from state law, and explained the nexus between those regulations and the protection of federal lands.  Utah's response ignores those regulations as well.  The United States then provided case law supporting the settled proposition that agency regulations may incorporate or adopt standards from state law.  Utah's opposition simply posits the opposite, without offering

any supporting case law.  Finally, the United States highlighted the plain constitutional infirmities inherent in Section 76-8-512(4), which purports to make it a crime for certain federal employees to perform the job duties assigned to them by federal law unless they adhere to the state's conditions.  For over a century, the Supreme Court and the federal Circuit Courts have uniformly held that the Constitution prohibits such state criminal sanctions on federal activity. In response to this uniform caselaw, Utah never even acknowledges the existence of Section 76-8-512(4), and certainly offers no caselaw supporting the validity of the provision.

The United States has shown that it is likely to succeed on the merits of its claims, and that it satisfies the remaining requirements for preliminary relief, while the State has failed to rebut that showing.  Therefore, the Court should grant the United States' motion and enter a preliminary injunction enjoining Sections 53-13-106.5 and 76-8-512(4).

<b>ARGUMENT</b>

**I.      THE UNITED STATES IS LIKELY TO PREVAIL ON THE MERITS OF ITS CHALLENGE TO SECTIONS 53-13-106.5 AND 76-8-512(4)**

The United States is likely to succeed on the merits because Sections 53-13-106.5 and 76-8-512(4) regulate federal agents in the performance of their federal duties, restrict the federal government's constitutional authority to use and manage federal land and property, and otherwise conflict with federal law.

**A.      The Utah Laws Violate the Doctrine of Intergovernmental Immunity**

The United States' motion explained that the Utah laws violate the doctrine of intergovernmental immunity because a state may not "constrain the conduct of federal agents and employees," even when they act within a particular state.  *City of Arcata*, 629 F.3d at 991. The Utah laws plainly violate this standard by criminalizing the exercise of federal enforcement

3

authority.  The United States' motion supported this argument with the citation of over a
century's worth of case law that has uniformly held such sanctions to be unconstitutional.  In
response, Utah offers almost no argument.  An introductory paragraph of the State's brief says
that HB 155 "neither conflicts with federal law nor trespasses on the doctrine of
intergovernmental immunity," *see* Defs.' Opp'n 1, but Utah never elaborates on the doctrine,
addresses any of the case law cited by the United States, or offers *any* affirmative support
suggesting that it may criminally sanction federal enforcement efforts.  While intergovernmental
immunity and preemption both arise under the Supremacy Clause, they are distinct doctrines that
are analyzed under different bodies of law.  *See, e.g.*, *North Dakota v. United States*, 495 U.S.
423 (1990); *Treasurer of New Jersey v. U.S. Dep't of Treasury*, 684 F.3d 382, 406 (3d Cir.
2012); *City of Arcata*, 629 F.3d at 992; *Arizona v. Bowsher*, 935 F.2d 332, 334-35 (D.C. Cir.
1991).

   The only substantive argument Utah hints at is that the State's laws do not violate the
doctrine because they are "consistent with federal law and the United States Constitution."  *See*
Defs.' Opp'n 3.  It is incorrect, however, to say that the Utah laws are consistent with federal law
because Utah unquestionably purports to impose additional restrictions on the federal
government that do not already exist in federal law.  But Utah's argument also suffers a more
basic legal problem: "there is no exception to the doctrine of intergovernmental immunity for
state statutes consistent with federal law."  *City of Arcata*, 629 F.3d at 991 (rejecting municipal
ordinances despite the cities' assurances that they would be enforced only to the extent consistent
with federal law).  A state simply may not impose this type of sanction on federal enforcement

efforts, even if the state believes that such enforcement activities exceed the federal government's statutory or constitutional authority.

Utah cites no authority, and the United States is aware of none, recognizing such an exception to the intergovernmental immunity doctrine.  Moreover, carving out such an exception would create the potential for state and local governments to harass based on purported violations of federal law and chill the conduct of federal employees and officers.  For example, in this case, the United States has offered evidence that the criminal penalties for violating the state laws might well lead federal law enforcement officers to avoid enforcing federal law, for fear of incurring personal liability.  *See, e.g.*, Boik Decl. (Dkt. 3-4) ¶ 20; Finley Decl. (Dkt. 3-5) ¶¶ 19-20.  The exception to the doctrine advocated by Utah would effectively permit state and local jurisdictions to exercise oversight and control over federal functions – precisely what intergovernmental immunity is intended to prevent.  Even if the requirements of Sections 53-13-106.5 and 76-8-512(4) went no further than federal law – which they do – the laws would thus still violate the doctrine of intergovernmental immunity, because "[a] state or local law that directly regulates the conduct of the federal government or discriminates against it is invalid, even if it is no more restrictive than federal law."  *City of Arcata*, 629 F.3d at 991.

Moreover, Utah's brief is conspicuously silent as to the effect of Section 76-8-512(4), which purports to criminalize the actions of certain federal officers who are engaged in the duties required of their jobs.  In the face of more than a century of settled Supreme Court precedent that a state may not criminalize the actions of federal employees, *see* Pl.'s Mot. 18-19, Utah never even acknowledges this criminalization provision, let alone addresses the relevant case law.

Because Sections 53-13-106.5 and 76-8-512(4) will "impede, burden, or in any manner control" the federal government's execution of the law, *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 317 (1819), these laws violate the doctrine of intergovernmental immunity.

### B.   The Utah Laws Conflict With Federal Law and Are Thus Preempted

As an alternative ground for its Supremacy Clause challenge, the United States' motion explained that Sections 53-13-106.5 and 76-8-512(4) are invalid because they conflict with federal law by purporting to forbid the enforcement of valid federal requirements.  Congress has given DOI and USDA broad authority over federal lands, including the authority to issue regulations necessary to manage and protect those lands, *see, e.g.*, 43 U.S.C. § 1733(a); 16 U.S.C. § 551; and the agencies have promulgated various regulations governing conduct on federal land.  When an agency promulgates such a regulation, the regulation becomes a part of federal law, and a violation of that regulation is itself a violation of federal law.  The United States' motion demonstrated that, by purporting to deny the federal government the authority to enforce such regulations unless it complies with terms set by the State, Utah's laws impose substantial obstacles to the accomplishment of congressional objectives.

In its response, Utah fails to overcome the United States' showing on the merits.  The State cites virtually no case law discussing preemption.  Instead, Utah dedicates several pages of its brief to attacking straw men of its own creation, arguing first that the federal government may not "unilaterally enforce Utah law."  *See* Defs.' Opp'n 5, 8.  The federal government is not relying on such authority; instead, this case concerns the enforcement of *federal* law, including (but not limited to) regulations that adopt or incorporate standards from state law.  Utah contends that Congress has not given DOI and USDA the authority to enact such regulations, but the State

simply ignores the statutory authority cited in the United States' opening brief – statutes whose validity is undisputed.  Second, Utah argues that its laws are meant to enforce what Utah believes Congress meant when it authorized the federal government to cooperate with the states.  Utah's reading of the relevant federal statutes is incorrect, but in any event Utah's chosen means of enforcement – prohibiting federal agencies from exercising law enforcement authority and criminalizing the conduct of certain federal employees – are plainly inconsistent with the legal structure established by Congress.  By imposing state limitations on DOI's and USDA's ability to exercise authorities granted by Congress, Sections 53-13-106.5 and 76-8-512(4) are preempted by federal law.

### 1.    Sections 53-13-106.5(2) and (6) Conflict With Federal Law

The United States' motion explained that Sections 53-13-106.5(2) and (6) are invalid because they purport to prohibit certain federal employees from enforcing various federal regulations governing conduct on federal lands.[2]  *See* Pl.'s Mot. 23-24, 27-30.

---

[2] With respect to the Forest Service, Section 53-13-106.5(6) applies to any "United States Forest Service employee who is not a trained and certified law enforcement officer."  The United States' opening brief notes that the Utah Code separately defines the term "certified" and identifies the requirements that an officer must satisfy to be certified.  *See* Pl.'s Mot. 27 n.8 (discussing Utah Code § 53-13-101(2)).  In response, Utah contends that "[t]he statute does not dictate that Forest Service employees must be certified under Utah law, rather, the statute merely recognizes Utah's interest in ensuring that those who enforce its laws are capable of doing so."  Defs.' Opp'n 4.  While that hardly clarifies how Utah interprets the provision, this argument does not comport with the statutory terms used by the legislature.  Section 53-13-101 sets forth definitions of terms "as used in this chapter," *i.e.*, chapter 13 of title 53.  Section 53-13-106.5(6) falls within the same chapter.  *See Grynberg v. Quester Pipeline Co.*, 70 P.3d 1, 8 (Utah 2003) ("When a term is defined within the statute, we look to that definition for guidance when interpreting the statute rather than revert to the 'ordinary and accepted meaning' of the term."); Utah Code Ann. § 68-3-11 (Utah Code rule of construction providing that "[w]ords and phrases are to be construed according to the context and the approved usage of the language," and that words that "have acquired a peculiar and appropriate meaning in law, *or are defined by statute, are to be construed according to such peculiar and appropriate meaning or definition*") (emphasis

In its response, Utah recognizes that these sections purport to question the ability of DOI and USDA to exercise law enforcement authority "on federal land by adopting state law standards through their rule-making powers."  Defs.' Opp'n 4.  But rather than address that issue, the State resorts to obfuscation, as it argues that "Congress did not grant DOI [or USDA] the authority to unilaterally enforce Utah law."  Id. at 5, 8.  By focusing on the enforcement of state law, rather than federal regulations that adopt standards from state law, Utah's argument distorts the issue and misses the mark.  When a federal law enforcement officer arrests an individual for the violation of a federal regulation, the officer is enforcing federal law, even if the regulation incorporates or adopts specific standards from state laws.  See, e.g., United States v. Bohn, 622 F.3d 1129, 1135 (9th Cir. 2010) (recognizing that enforcement of an NPS regulation "that incorporates state law by reference" constitutes enforcement of a federal regulation).

The question presented to the Court is thus not whether the federal government may "unilaterally enforce Utah law."  Rather, this case concerns Utah's attempt to stop federal agencies from enforcing regulations that adopt standards from the laws of the state in which federal land is located.  When the issue is properly understood, there is little doubt that DOI and USDA have the authority to enact the type of regulations at issue.  In arguing otherwise, Utah quotes selectively from various statutes that either authorize federal agency employees to exercise law enforcement authority or authorize the agencies to cooperate with state and local officials.  See Defs.' Opp'n 5-9.  But Utah conspicuously fails to consider the Property Clause or to address the statutes that the United States relied on in its brief.

---

added).  In any event, Utah offers no response to the legal proposition set forth in the United States' opening brief: a state may not require federal officers to be certified in accordance with state law in order to engage in law enforcement activities on federally managed land.  See Pl.'s Mot. 27 n.8 (discussing case law).

As a starting point, there is no doubt that Congress has the constitutional authority to authorize agencies to issue regulations that adopt standards from state law, as the Constitution reserves to "Congress the power to control the[] occupancy and use [of federal lands], to protect them from trespass and injury and to prescribe the conditions upon which others may obtain rights in them." *Utah Power & Light Co. v. United States*, 243 U.S. 389, 405 (1917). Indeed, the "power over the public land thus entrusted to Congress is without limitation." *United States v. City & Cnty. of San Francisco*, 310 U.S. 16, 29 (1940). Utah does not appear to argue otherwise, instead claiming that Congress has not given such authority to the agencies.

It is equally clear, however, that Congress has authorized the agencies to enact such regulations. This is an especially important point because it is Utah's interference with these congressional grants of authority that gives rise to preemption. But while the United States' opening brief discusses the statutes that authorize DOI and USDA to promulgate and enforce regulations, Utah's brief simply ignores those authorities. For example, Congress authorized the Secretary of the Interior to "issue regulations necessary to implement the provisions of [the Federal Land Policy and Management Act (FLPMA)] with respect to the management, use, and protection of the public lands, including any property located thereon," 43 U.S.C. § 1733(a), and to "make and publish such rules and regulations as he may deem necessary or proper for the use and management" of lands under the jurisdiction of NPS, 16 U.S.C. § 3. Similarly, Congress authorized the Secretary of Agriculture "to make such rules and regulations" as necessary to regulate the occupancy and use of the national forests, and to preserve them from destruction. *Id.* § 551. These authorities were raised in the United States' motion, *see* Pl.'s Mot. 4-7, 9-10, 22-24, but none are addressed by Utah.

Congress's enactment of these provisions gave DOI and USDA broad discretionary authority to promulgate regulations in order to accomplish Congress's objectives for the protection of federal lands.  See *Public Lands Council v. Babbitt*, 167 F.3d 1287, 1290 (10th Cir. 1999) (recognizing, in the context of a similar statute, that phrases like "such rules and regulations" indicate that "the means that the Secretary may employ to accomplish the purposes of the Act are nearly completely at his discretion); *Nat. Resources Def. Council, Inc. v. Jamison*, 815 F. Supp. 454, 456 (D.D.C. 1992) (recognizing that 43 U.S.C. § 1733(a) delegates "broad authority" to the Secretary); *Wilkensen v. Dep't of Interior*, 634 F. Supp. 1265, 1279 (D. Colo. 1986) (recognizing that the grant of authority to the Secretary by 16 U.S.C. § 3 "is very broad"); *Mountain States Tel. & Tel. Co. v. United States*, 499 F.2d 611, 614 (Ct. Ct. 1974) (recognizing that 16 U.S.C. § 551 "reveals a clear intent of Congress to commit regulation of the national forests to the discretion of the Secretary").  Moreover, when a statute authorizes an agency to issue regulations necessary to implement or to carry out an act, "[t]he Secretary's judgment that a particular regulation fits within this statutory constraint must be given considerable weight." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 87 (2002) (considering the Family Medical Leave Act).  And, in this case, Utah has not seriously suggested that the regulations targeted by the state fall outside the range of activities regulated by the relevant federal statutes.

By failing to address these provisions in its brief, Utah ignores the very federal law that gives rise to preemption in this case.[3]  It is pursuant to these authorities that the agencies have

---

[3] Instead of addressing these provisions, Utah's brief points to other provisions in which Congress has authorized federal agencies to cooperate with state and local law enforcement officials on federal lands.  *See, e.g.*, 16 U.S.C. §§ 1a-6(c)(2), 559g(c); 43 U.S.C. §§ 373b(c)(2), 1733(d).  Generally, these statutes provide legal authority for the agencies to cooperate with and assist state and local law enforcement officials.  Each of these provisions broadens the agencies'

adopted numerous regulations governing conduct on federal lands, including regulations that adopt or incorporate by reference standards from state law.  *See* Pl.'s Mot. 4-11.  DOI and USDA could have adopted rules that spell out a litany of restrictions on activities that affect federal property without making any reference to state law, but in certain cases they chose to cross-reference state laws, which already contain detailed proscriptions, in order to apply standards consistent with the states in which the federal land is located.  As an example, consider the Forest Service's rules concerning the operation of motor vehicles on roads within national forests.  Utah appears not to dispute that the Forest Service could make it a violation of federal law to operate a vehicle within a national forest with a blood alcohol content of .08% or greater, but Utah contends that the Forest Service may not tie the blood alcohol content limit to that permitted by the law of the state in which the forest is located.  Yet Utah has failed to offer any legal basis for a distinction between those two regulations.  Both regulations constitute federal law, both protect the forests and the people who use them, and both are authorized by Congress's broad delegation of authority to USDA.

     Utah's brief also confirms that the United States has the support of all identified legal precedent on this issue.  In its motion, the United States identified cases from various circuits

---

authority; they do not restrain the agencies' authority to enforce federal law or, more to the point, their ability to promulgate federal regulations.  Insofar as a state may seek an agency's assistance in the enforcement of *state* law, these provisions may apply, but they provide no support to Utah's attempt to constrain the federal government's enforcement of federal law.  Utah's effort to present Sections 53-13-106.5 and 76-8-512(4) as an attempt to facilitate further cooperation between the federal and state governments can hardly conceal that the state's laws would preclude federal actions on federal land.  Moreover, Utah's law is particularly misguided because there is no threat to the state's enforcement of state law.  *See, e.g.*, *Cal. Coastal Commission v. Granite Rock Co.*, 480 U.S. 572, 580-81 (1987) (recognizing that states are free to enforce their criminal and civil laws on federal land so long as those laws do not conflict with federal law); *United States v. County of Fresno*, 429 U.S. 452, 455 (1977) (recognizing that persons within the national forests remain subject to the application of state and local laws).

supporting the settled proposition that federal regulations may incorporate state law standards. *See* Pl.'s Mot. 29-30.  In response, Utah makes a half-hearted attempt to disagree, arguing in a footnote that the cases are inapposite.  *See* Defs.' Opp'n 5 n.6.  But the State's distinctions are unpersuasive.  The State notes that none of the cases cited by the United States concerned a situation where an attempt to incorporate state law standards had been "explicitly prohibited by state law." *Id.*  But the United States is aware of no case – and Utah has certainly identified no case – in which a state has been permitted to "explicitly prohibit[]" the federal government from adopting federal regulations that would otherwise be valid under federal law.  Besides, Utah's approach has the inquiry exactly backward:  If the regulations are valid (a point confirmed by the cases cited in the United States' motion), then, by definition, the Supremacy Clause prohibits the type of state prohibition hypothesized by Utah's opposition.  *See also Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) (recognizing that "[f]ederal regulations have no less pre-emptive effect than federal statutes").  That Utah has failed to identify a case involving such an "explicit prohibit[ion]" by a state is no doubt due to the fact that any such state law would inherently conflict with federal law, and would thus be preempted.  In any event, if Utah's point is that no other state has gone as far as Utah has, that hardly provides legal support for its argument.

The State's failure to identify any relevant precedent on this point underscores a larger flaw in its response: it has offered almost no case law in support of its argument on preemption. This is telling given the breadth of the State's argument.  Utah contends that a state may prohibit the federal government from exercising law enforcement authority on federal land when the federal law or regulations at issue adopt state law standards.  As a practical matter, the State's

argument would have wide-reaching effects, as it could effectively allow a state to nullify a broad range of longstanding federal regulations respecting federal lands.  Any attempt by a state to impose conditions on the authority of the federal government warrants close scrutiny under the Supremacy Clause, but that is especially true when the restrictions concern public lands, where the power that is entrusted to Congress by the Property Clause "is without limitations."  *City & Cnty. of San Francisco*, 310 U.S. at 29.  In support of its remarkably broad argument, the State offers virtually no legal support.  Utah claims that it may restrict the federal government's enforcement of regulations on federal land, but it has identified no cases in which a state's authority to do so has been upheld.  Indeed, Utah cannot point to any case where a court has found that the federal government lacked the authority to enforce even *one* such regulation.  At the very least, the fact that all relevant precedent identified by the parties favors one side demonstrates that the United States is likely to succeed on the merits of its claims.

In sum, Congress charged DOI and the USDA with adopting regulations to implement specific statutes, and yet Utah now purports to deny the federal government the authority to enforce those regulations.  Because "[a] state law . . . is pre-empted if it interferes with the methods by which the federal statute was designed to reach [its] goal," *Int'l Paper Co. v. Oullette*, 479 U.S. 481, 494 (1987), Sections 53-13-106.5(2) and (6) are invalid.

### 2.      Section 53-13-106.5(4) Conflicts With Federal Law

The United States' brief also explained that Section 53-13-106.5(4) purports to impose unwarranted restrictions on DOI's management of federal lands by requiring the agency to satisfy various criteria established by the state before it can exercise law enforcement authority. In response, Utah contends that Section 53-13-106.5(4) "does not place restrictions on DOI."

Defs.' Opp'n 9. The State suggests that the statutory provision is valid because it "essentially restat[es]" requirements that already apply to the Bureau of Land Management (BLM) in 43 U.S.C. § 1733. _Id._ at 10. The notion that this provision merely "restates" federal law is hard to reconcile even with the title of Section 53-13-106.5, "State limitations on functions of federal law enforcement officers," and a closer look at the text of the statute confirms that Utah's argument is wrong for several reasons.

First, Section 53-13-106.5(4) purports to limit DOI employees to exercising authority that has been granted by only one of the many statutes that Congress enacted to govern DOI-managed land. The provision expressly applies to all "employees or agents of the United States Department of Interior," Utah Code Ann. § 53-13-106.5(4), but it purports to limit DOI employees to exercising law enforcement authority that was granted by the FLPMA in 43 U.S.C. § 1733. (This is true of each part of the provision, but most especially Section 53-13-106.5(4)(a)(ii).) It is certainly not true that federal law limits DOI only to the authority granted by the FLPMA. As the United States explained in its brief, Congress has provided DOI with law enforcement authority under a range of statutes. _See_ Pl.'s Mot. 27 (identifying examples). Because Section 53-13-106.5(4) purports to limit DOI to exercising authority granted by 43 U.S.C. § 1733, it interferes, facially, with Congress's objectives in empowering the agency under the other statutes.

Second, Section 53-13-106.5(4)(a)(i) is invalid because it purports to require the Secretary of the Interior to take action that Congress left to her discretion. Through 43 U.S.C. § 1733(c)(2), Congress provided that, "[w]hen the Secretary determines that assistance is necessary in enforcing Federal laws and regulation relating to the public lands or their resources

he shall offer a contract to appropriate local officials. . . ."  Section 53-13-106.5(4)(a) elevates the latter portion of the provision into a mandatory precondition to DOI exercising any law enforcement authority within the state.  But for the reasons explained in the United States' motion, Utah has no role to play in determining when the authorities of Section 1733(c)(2) should be applied.  While Utah's brief spends several pages arguing that "assistance is necessary," Congress did not charge the State with making that determination.  Instead, Congress left that determination to the Secretary, and in doing so it gave her significant discretion.  *See Pacific Legal Found. v. Watt, 529 F. Supp. 982, 999 (D. Mont. 1981)* (recognizing discretion granted by similar provision, 43 U.S.C. § 1714(e)).  By usurping the Secretary's role, Section 53-13-106.5(4)(a) interferes with Congress's objectives.[4]  *See Int'l Paper Co., 479 U.S. at 494* ("A state law . . . is pre-empted if it interferes with the methods by which the federal statute was designed to reach [its] goal.").

Third, Section 53-13-106.5(4) is invalid because it purports to deny *all* enforcement authority to DOI employees if the agency does not comply with Utah's interpretation of 43 U.S.C. § 1733(c).  Utah contends that declaratory relief against the state law "would have no

---

[4] Utah is also incorrect in arguing that the Secretary has already determined that, throughout the state, "assistance is necessary in enforcing Federal laws and regulations relating to the public lands."  43 U.S.C. § 1733(c)(2).  It is worth noting that, because the FLPMA is a statute administered by DOI, the agency's interpretation of any ambiguity in Section 1733(c)(2) is entitled to deference.  *See Chevron U.S.A. Inc. v. Nat'l Resources Defense Council Inc., 467 U.S. 837, 842 (1984).*  In any event, the Court need not and should not address whether the terms of Section 1733(c)(2) have actually been satisfied because that issue is not properly presented by this case, nor could it properly be decided based on the record before the Court.  If a party believes that a federal agency has unlawfully failed to take actions required by statute, it should pursue a claim under the Administrative Procedure Act, which empowers a court to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  The fact that such a suit would fail in these circumstances is hardly grounds for Utah pursuing an alternative course of prohibiting (and criminalizing) the acts of federal law enforcement officers instead.

effect because DOI would still be under the requirements of" Section 1733(c).  *See* Defs.' Opp'n 15.  That is plainly incorrect, because even Congress did not make compliance with Section 1733(c) a prerequisite to DOI exercising any law enforcement authority within a particular state.  Even if the state law merely required compliance with Section 1733(c) – and it does much more, for the reasons explained above – the consequences imposed by Utah's law are wholly improper.  Utah purports to condition *all* of DOI's law enforcement authority in the state on its compliance with Section 1733(c), when Congress has done no such thing.  It is up to Congress to establish the conditions under which an agency may exercise the authorities granted to it by federal statute, and Utah identifies nothing in Section 1733 (or any other provision of federal law) that makes compliance with Section 1733(c)(2) a necessary precondition to the exercise of federal law enforcement authority.  While Congress could have imposed such a restraint in the FLPMA, it did not so.  Utah's attempt to impose a sanction of its own choosing plainly impedes Congress's objectives.  *See Arizona v. United States*, 132 S. Ct. 2492, 2503, 2505 (2012) (finding preemption of state law provisions that sought to impose penalties for lack of compliance with federal law).

### 3.     Section 76-8-512(4) Conflicts With Federal Law

The United States' motion also explained that Section 76-8-512(4) is invalid because it purports to criminalize particular employees' exercise of their job duties.  Utah's response does not mention this provision, let alone explain how it could be constitutional.  The State's failure to respond to the United States' argument should constitute a concession of this issue, *see Klein-Becker USA LLC v. Englert*, No. 2:06-0cv-00378, 2007 WL 2821621, at *1 (D. Utah Sept. 26, 2007), but in any event the United States has shown that it is likely to succeed on this claim.

And the infirmity of this section more broadly demonstrates how the remainder of the provisions challenged in this litigation – provisions which Utah would enforce through this criminal sanction – seek to interfere with the enforcement of federal law and are therefore preempted.

### C.    The United States Has Satisfied the Requirements for a Facial Challenge

In its opposition, Utah also argues that the United States is unlikely to succeed on the merits because it has brought a facial challenge.  Defs.' Opp'n 1.  Utah avers that facial challenges are disfavored, in part, because they "often rest on speculation," and contends that, to prevail on its facial constitutional challenge, the United States must satisfy the formulation set forth in *United States v. Salerno*, 481 U.S. 739, 745 (1987), by establishing that "no set of circumstances exists" under which the challenged law would be valid.  Defs.' Opp'n 1-2.

Although it places significant weight on *Salerno*, Utah has failed to identify any application of Sections 53-13-106.5 and 76-8-512(4) that would be valid under the Supremacy Clause.  Nor can it: the challenged Utah statutes seek to impose criminal sanctions on the enforcement of federal law and otherwise prohibit the enforcement of valid federal laws – state actions that are always violative of the Constitution, for reasons described in the United States' motion.

Moreover, the cited *Salerno* standard does not even apply to this dispute.  As the Tenth Circuit explained "[t]he idea that the Supreme Court applies the 'no set of circumstances' test to every facial challenge is simply a fiction, readily dispelled by a plethora of Supreme Court authority."  *Doe v. City of Albuquerque*, 667 F.3d 1111, 1124 (10th Cir. 2012).  Indeed, the

17

Supreme Court has not applied *Salerno* in numerous recent facial preemption challenges.[5]  *See, e.g.*, *Arizona*, 132 S. Ct. 2492; *Am. Ins. Assoc. v. Garamendi*, 539 U.S. 396 (2003); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).  The fact that the United States brings a facial challenge to the Utah laws "does not automatically compel the application of a specific test, much less the *Salerno* formulation."  *City of Albuquerque*, 667 F.3d at 1124.  Instead, when adjudicating facial constitutional challenges, courts should simply "apply[] the relevant constitutional test to the challenged statute without attempting to conjure up whether or not there is a hypothetical situation in which application of the statute might be valid."  *Id.*  Here, the relevant standards are those related to the Supremacy Clause, specifically the doctrines of intergovernmental immunity and conflict preemption, as set forth in the United States' motion and above.

By their own terms, Sections 53-13-106.5 and 76-8-512(4) fail these tests.  No speculation is required to see that these provisions, on their face, purport to limit the circumstances in which the federal government may exercise law enforcement authority on federal lands within the state, and that they support that limitation with criminal penalties. (Indeed, that is the plain purpose of these provisions.)  Likewise, Utah has not disputed that its laws purport to restrict DOI and USDA from enforcing certain federal laws on federal land, including regulations that "adopt[] state law standards."  Defs.' Opp'n 4.  Because the provisions at issue purport to regulate the conduct of federal officials and conflict with federal law, they are

---

[5] Utah also cites to the Supreme Court's decision in *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) in support of its assertion that the *Salerno* formulation is the controlling standard in facial challenges.  Defs.' Opp'n 2.  But as the Tenth Circuit observed, the Court in *Washington State Grange* "noted the criticism of *Salerno* and indicated that it was not relying on this test."  *City of Albuquerque*, 667 F.3d at 1127 (citing *Wash. State Grange*, 552 U.S. at 449).

facially invalid, and the United States has demonstrated that it is likely to prevail on the merits of its claims.

## II. IMPLEMENTATION OF SECTIONS 53-13-106.5 AND 76-8-512(4) WILL IRREPARABLY HARM THE UNITED STATES AND BURDEN THE PUBLIC INTEREST

The United States' motion also advanced six different types of irreparable injury that will result from the implementation and enforcement of Sections 53-13-106.5 and 76-8-512(4). Utah's opposition does not meaningfully respond to any of these arguments. Indeed, the State acknowledges only one of the six, when it contends that the risk of criminal prosecution under Section 76-8-512(4) is "hypothetical." *See* Defs.' Opp'n 18. Yet the United States provided evidence demonstrating that Forest Service and BLM officers will be subject to an imminent risk of criminal charges or arrest, including evidence that local law enforcement officials have expressed an intent to use the Utah laws to arrest federal law enforcement officials for performing their law enforcement functions. *See* Pl.'s Mot. 33-34; Boik Decl. (Dkt. 3-4) ¶¶ 21-22. Utah's response consists of one conclusory sentence.[6] And while the United States has articulated several other acute, specific harms that will result from the implementation of the Utah laws, the State is silent in response.

The United States' unrebutted evidence of irreparable injury also suffices to show how Sections 53-13-106.5 and 76-8-512(4) will burden the United States and the public interest. Whereas the United States has articulated with specificity the harms that implementation will

---

[6] It is also worth noting that the *amici*, the Utah Association of Counties and the Utah Sheriffs Association, purport to speak on behalf of county sheriffs in the state and to address how the sheriffs "intend to apply" particular provisions of the law. *See* Amicus Br. 12 n.3. While the United States does not agree that the *amici* are competent to do so, given the limited information they provided about their organizations and their authority over sheriffs, it is notable that their brief says nothing whatsoever about the criminalization provision at Section 76-8-512(4).

cause to the public interest, Utah responds with bland citations to cases concerning jurisdictional questions.  *See* Defs.' Opp'n 19.  Utah further contends that issuance of a preliminary injunction will upset "the balance between the respective powers of the states and the Federal government." *Id.* at 20.  Of course, the very purpose of Sections 53-13-106.5 and 76-8-512(4) is to upset the existing balance by prohibiting and criminalizing the federal government's ongoing activities on federal lands.  Because Utah "does not have an interest in enforcing a law that is likely constitutionally infirm," *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010), these factors weigh decisively in favor of a preliminary injunction.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in the United States' opening brief, the Court should issue a preliminary injunction prohibiting the implementation and enforcement of Sections 53-13-106.5 and 76-8-512(4) of the Utah Code.[7]

Dated: June 14, 2013.              Respectfully submitted,

                                    */s/ Scott Risner*
                                   RYAN PARKER (Bar # 11742) *
                                   SCOTT RISNER (MI Bar #P70762) *
                                   Trial Attorneys
                                   Department of Justice
                                   Civil Division, Federal Programs Branch
                                   20 Massachusetts Ave., N.W.
                                   Washington, DC 20001
                                   Telephone:    (202) 514-2395
                                   Facsimile:    (202) 616-8470
                                   E-mail:       scott.risner@usdoj.gov

                                   Attorneys for the United States

                                   * Admitted *pro hac vice*

---

[7] Utah's response contends that the Court should sever any invalid portions of the law from its remainder.  *See* Defs.' Opp'n 19 n.11.  The State offers little argument on this point, which would be better addressed through supplemental briefing, if necessary.